**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 5 2004**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

    v.

SAMUEL PULIDO-JACOBO;
ESEQUIEL PULIDO-PEDROSA, also
known as Joel Arrollo-Naranjo,

        Defendants - Appellants.

No. 03-8050 & 03-8053

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**
**(D. Ct. Nos. 02-CR-190-02-B & 02-CR-190-01-B)**

---

James H. Barrett, Assistant Federal Defender, Office of the Federal Public Defender, Cheyenne, Wyoming, appearing for Appellant Pulido-Jacobo.

Mr. Thomas B. Jubin, Esquire, Jubin & Zerga LLC, Cheyenne, Wyoming, appearing for Appellant Pulido-Pedrosa.

L. Robert Murray, Assistant United States Attorney (Matthew H. Mead, United States Attorney, with him on the brief), Office of the United States Attorney, Cheyenne, Wyoming, appearing for Appellee.

---

Before **TACHA** , Chief Circuit Judge,   **BRISCOE** , Circuit Judge, and

**LUNGSTRUM** ,[*] Chief District Judge.

**TACHA** , Chief Circuit Judge.

A jury found Defendant-Appellants Samuel Pulido-Jacobo and Esequiel Pulido-Pedrosa (collectively "the Pulidos") guilty of possessing with intent to distribute, and conspiracy to possess with intent to distribute, methamphetamine. On appeal, they claim four errors: (1) insufficient evidence of guilt, (2) improper admission of evidence, (3) improper denial of their mistrial motion, and (4) prosecutorial misconduct. We take jurisdiction pursuant to 28 U.S.C. § 1291 and AFFIRM.

## I. BACKGROUND

A Wyoming Highway Patrol officer stopped a car driven by Mr. Pulido-Pedrosa for traveling 108 miles per hour in a 75-mile-per-hour speed zone. Mr. Pulido-Jacobo rode in the front passenger seat of the car, while Mr. Sandoval-Alvarez rode in the back seat. Following the officer's request, Mr. Pulido-Pedrosa handed the officer a driver's license identifying himself as Joel A. Naranjo and a temporary insurance card for Joel Arrollo-Naranjo. Upon further investigation, the officer discovered that the vehicle was registered to Cesar

[*] Honorable John W. Lungstrum, Chief District Judge, United States District Court for the District of Kansas, sitting by designation.

Aaron Morales. After learning these facts, and detecting a number of air-fresheners in the car, the officer called for a second officer with a drug dog to assist on the scene.

The second officer arrived and questioned Mr. Pulido-Pedrosa, while the first officer wrote the traffic citation. When asked about his travel plans, Mr. Pulido-Pedrosa turned to Mr. Pulido-Jacobo and addressed him in Spanish. After hearing Mr. Pulido-Jacobo's response in Spanish, Mr. Pulido-Pedrosa told the second officer that they were traveling to Omaha, Nebraska to visit a friend.

When next asked who owned the car, Mr. Pulido-Pedrosa responded by saying "No English," but, after the officer rephrased the question, Mr. Pulido-Pedrosa answered, "My boss." When asked for consent to search the car, he responded, "I don't speak English." When the officer asked Mr. Pulido-Pedrosa again, however, Mr. Pulido-Jacobo said, "Oh yeah, you can search the car," to which Mr. Pulido-Pedrosa followed, "Yeah, yeah."

The officers then removed the three occupants from the car and began their search. After removing part of the back seat, the officers noticed that, despite the absence of screws from the metal lid separating the gas tank from the inside of the car, the lid was tightly attached from inside the gas tank. After prying the lid partially open, the officers observed a number of bags containing round objects wrapped in black tape. The drug dog did not react initially to this discovery;

however, it did after the officers punctured one of the round objects, which later tested positive for methamphetamine.

During questioning at the highway patrol station, Mr. Pulido-Pedrosa contradicted two statements that he made earlier to the officers. First, in contrast to his earlier assertion that he was driving Mr. Sandoval-Alvarez to Omaha, Mr. Pulido-Pedrosa stated that he was "just along for the ride and not sure where he was going . . . [but he] thought . . . someplace in Wyoming." Second, again in contrast to his earlier claim that the car belonged to "a friend" or to "his boss," he stated that a man he knew only as "Coyote" owned the car.

In his interview, Mr. Pulido-Jacobo claimed that the only clothes in the car—a pair of shorts, a shirt, and a toothbrush—belonged to him. He stated that Mr. Pulido-Pedrosa picked him up at a soccer field to travel to Omaha for a "one-night party." A search of their belongings indicated that Mr. Pulido-Pedrosa had $1210 in his wallet. Mr. Pulido-Jacobo had $75 in his wallet and copies of two receipts, one for a speaker box containing two box speakers ("the speaker receipt") and the other for repair work on a truck engine ("the engine receipt").

A federal grand jury indicted the Pulidos for (1) possessing methamphetamine with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A); and (2) conspiring to traffic in methamphetamine in violation of 21 U.S.C. § 846. The grand jury also indicted Mr. Pulido-Pedrosa individually for

illegally re-entering the United States after previously being deported in violation of 8 U.S.C. §§ 1326(a)(1) and (b)(2). Mr. Pulido-Pedrosa pleaded guilty to this latter count; however, he and Mr. Pulido-Jacobo pleaded innocent to all other counts. A jury found them guilty of all charges. The Pulidos timely appealed, bringing four claims. We address each below.

## II. SUFFICIENCY OF THE EVIDENCE

The Pulidos contend that insufficient evidence exists to support their convictions for conspiracy and possession with intent to distribute. Specifically, they argue that "mere control or dominion over the . . . [car was] not enough to establish constructive possession" of the narcotics contained within it and that no evidence exists that they knew of the well-hidden and odorless drugs. In response, the government claims that the evidence is sufficient to support the essential elements of the claims against the Pulidos.

A.    Standard of Review

"We review a challenge to the sufficiency of the evidence de novo, viewing all evidence and drawing all reasonable inferences in the light most favorable to the government." *United States v. Oliver*, 278 F.3d 1035, 1043 (10th Cir. 2001). Under this standard, "[w]e will not reverse a conviction . . . unless no rational trier of fact could have reached the disputed verdict." *United States v. Wilson*, 182 F.3d 737, 742 (10th Cir. 1999). "The evidence necessary to support a verdict need

-5-

not conclusively exclude every other reasonable hypothesis and need not negate all possibilities except guilt. Instead, the evidence only has to reasonably support the jury's finding of guilt beyond a reasonable doubt." *Id.*

B.     Conspiracy

"To obtain a conviction for conspiracy, the government must prove that (1) there was an agreement to violate the law; (2) Defendant knew the essential objectives of the conspiracy; (3) Defendant knowingly and voluntarily took part in the conspiracy; and (4) the coconspirators were interdependent." *United States v. Ailsworth*, 138 F.3d 843, 850 (10th Cir. 1998).

1.     *Agreement*

"To prove an agreement, the government need not offer direct proof of an express agreement on the part of the defendant. Instead the agreement may be informal and may be inferred entirely from circumstantial evidence." *United States v. Lang*, 364 F.3d 1210, 1223 (10th Cir. 2004) (quotations and alterations omitted). As to both Pulidos, the jury could reasonably infer the existence of an agreement from several facts introduced by the government. Particularly, the Pulidos told the officers multiple, conflicting stories regarding their travel plans and the ownership of the car; they shared driving responsibilities on the trip; and Mr. Pulido-Pedrosa consulted with Mr. Pulido-Jacobo before answering many of the officers' questions. *See United States v. Jones*, 44 F.3d 860, 868 (10th Cir.

1995) (noting that a jury can infer agreement from "evidence of conflicting stories."). Moreover, Mr. Pulido-Jacobo lied about both Mr. Pulido-Pedrosa's name and their relationship. *See United States v. Hooks*, 780 F.2d 1526, 1532 (10th Cir. 1986) (permitting an inference of guilt from false statements made by the defendant to police). In light of these and other facts, we find that a rational jury could infer the existence of an agreement.

2. *Essential Objectives*

Under this element, the government must prove that the alleged conspirator had a "general awareness of both the scope and the objective of the enterprise." *United States v. Evans*, 970 F.2d 663, 670 (10th Cir. 1992). For several reasons, we find that the government satisfied this standard.

First, we find it important that Mr. Pulido-Jacobo shared driving responsibilities with his father. As we have noted previously, "it is permissible to infer that the driver of a vehicle has knowledge of the contraband within it." *United States v. Levario*, 877 F.2d 1483, 1485-86 (10th Cir. 1989), *overruled on other grounds by Gozlon-Peretz v. United States*, 498 U.S. 395 (1991). Further, both Pulidos should have noticed and grown suspicious of the frequency of the stops for gas and the minimal amount of gas accepted by the car. The presence in the front console of the car of a copy of his September 2002 receipt for truck engine repair further illustrated his control over the car. We are also convinced of

this control by the August 2002 speaker receipt found in Mr. Pulido-Jacobo's wallet and the presence of a matching speaker box in the trunk of the car.

In addition, Mr. Pulido-Pedrosa initially gave the police a false name.[1] *See Hooks*, 780 F.2d at 1532 ("[T]he jury could have inferred appellant's guilty knowledge from the undisputed testimony that appellant gave the police a false name."). A rational jury could also infer knowledge of the essential elements of the conspiracy from the fact that Mr. Pulido-Pedrosa brought no clothes or personal effects with him and that Mr. Pulido-Jacobo had only one change of clothes and a toothbrush for a trip from California to Omaha, Nebraska—a round trip of over 3000 miles.

We further note that the methamphetamine was valued between $248,000 and $2.1 million. Given the substantial value of this contraband, a rational jury could conclude that it would not likely be placed in a car without the knowledge of its occupants. *See id.* (finding it unlikely that the owner of a substantial amount of drugs would have left them in a car without its occupant's knowledge). Finally, we note that, Mr. Pulido-Pedrosa carried $1210 in cash at the time of the arrest and admits to receiving payment from "Coyote" for making the trip. *See United States v. Lazcano-Villalobos*, 175 F.3d 838, 844 (10th Cir. 1999) ("[L]arge sums

---

[1]Although Mr. Pulido-Pedrosa claims to have concealed his identity solely to hide his illegal alien status, he continued to use a false name even after admitting this status to the officers.

of cash . . . are recognized tools of the drug trade."). Hence, we find that the government presented sufficient evidence to prove that both Pulidos had a general knowledge of the objectives of the conspiracy.

3.      *Knowing and Voluntary Involvement*

Relying on this same body of evidence, we also find that the government presented sufficient evidence to allow a rational jury to conclude that they engaged in the conspiracy knowingly and voluntarily. *United States v. Johnson*, 42 F.3d 1312, 1319 (10th Cir.1994) (noting that a jury may presume that "a defendant is a knowing participant in the conspiracy when he acts in furtherance of the objective of the conspiracy.") (quotations omitted).

4.      *Interdependence*

"Interdependence exists where each coconspirator's actions constitute essential and integral steps toward the realization of a common, illicit goal." *United States v. Carter*, 130 F.3d 1432, 1440 (10th Cir. 1997). The government sufficiently established interdependence here by showing the following: (1) shared driving responsibilities between Mr. Pulido-Pedrosa and Mr. Pulido-Jacobo; (2) efforts to conceal each other's identities, their travel purpose, and their relationship; and (3) Mr. Pulido-Pedrosa's consultation with Mr. Pulido-Jacobo before answering the officer's questions. Having found sufficient evidence to satisfy the four elements of a conspiracy, we affirm the conspiracy conviction

against both of the Pulidos.

C.    Methamphetamine Possession

"To prove a charge of possession with intent to distribute, the government must show that [1] the defendant possessed the controlled substance; [2] knew that he had it; and [3] possessed it with the intent to distribute it." *United States v. Allen*, 235 F.3d 482, 492 (10th Cir. 2000). "Possession may be actual or constructive." *United States v. Carter*, 130 F.3d 1432, 1441 (10th Cir. 1997). "To prove constructive possession where there is joint occupancy, the government must present direct or circumstantial evidence to show some connection or nexus individually linking [the appellants] to the contraband." *Lazcano-Villalobos*, 175 F.3d at 843. Moreover, a jury may infer intent to distribute from the possession of large quantities of drugs. *See United States v. Delreal-Ordones*, 213 F.3d 1263, 1268 n.4 (10th Cir. 2000).

Based on substantially the same evidence noted in the conspiracy claim, we find that the government presented sufficient evidence here to allow a rational jury to conclude that the Pulidos constructively possessed the methamphetamine in question, knew they possessed it, and intended to distribute it.

### III. ADMISSIBILITY OF THE RECEIPTS

The government offered two receipts found in Mr. Pulido-Jacobo's wallet, each bearing his name, into evidence. The District Court admitted both of them.

The first receipt is for a 12-inch custom speaker box, containing two 12-inch box speakers, dated August 1, 2002. The trunk of the car contained an unattached speaker box matching this description. The second receipt, dated September 2002, was from J.C. Engine Rebuilding Auto Repair. The District Court also admitted a copy of the engine receipt found in the front console of the car.

The Pulidos claim that the District Court improperly admitted these receipts pursuant to the Federal Rules of Evidence because they constitute hearsay. The government disputes this claim, arguing that the receipts are not hearsay because the District Court did not admit them "to prove the truth of the matter asserted." Fed. R. Evid. 801(c).

A.    Standard of Review

"Evidentiary rulings are committed to the discretion of the trial court, and we review them only for abuse of discretion. Our review is even more deferential where the evidentiary ruling concerns the admissibility of what is claimed to be hearsay evidence." *United States v. Cestnik*, 36 F.3d 904, 906-07 (10th Cir. 1994). Even if we find that the District Court erred, we must also determine whether the error is "harmless error." Fed. R. Crim. P. 52(a).

B.    Merits

"Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered to prove the truth of the matter asserted."

*United States v. Alahamad*, 211 F.3d 538, 542 (10th Cir. 2000). "Under Fed. R. Evid. 802, hearsay evidence that does not meet an exclusion or exception is generally inadmissable at trial." *Id.*

1.   *The Engine Receipt*

The engine receipts were not hearsay because the government did not submit it to prove the truth of the matter asserted (i.e., that Mr. Pulido-Jacobo paid for repairs on an engine in September 2002). Instead, the government offered the engine receipts only to show that Mr. Pulido-Jacobo had sufficient control of the car to store an old receipt in it. Therefore, the District Court did not abuse its discretion in admitting the engine receipts.

2.   *The Speaker Receipt*

Likewise, the speaker receipt was not hearsay because it constitutes an adoptive admission under Federal Rule of Evidence 801(d)(2)(B). Rule 801(d)(2)(B) provides that a statement is not hearsay if it is "offered against a party and is . . . a statement of which the party has manifested an adoption or belief in its truth." Fed. R. Evid. 801(d)(2)(B). In deciding this preliminary question of fact, we are not bound by the rules of evidence. *United States v. Harrison*, 296 F.3d 994, 1001 (10th Cir. 2002). "The Court determines the question under a preponderance-of-the-evidence standard." *Id.*

We distinguish this case from our holding in *United States v. Jefferson*, 925

F.2d 1242 (10th Cir. 1991).  In *Jefferson*, the government introduced into evidence a pager bill bearing the defendant's name to show that the defendant had purchased pager service.  Other than his name on the bill, no evidence existed that the defendant manifested a belief in the truth of the bill's contents.  Noting that there are "too many cases where the mere possession of a bill in no way constitutes an adoption of its contents," the *Jefferson* court refused to admit the pager bill as an adoptive admission.  *Id.* at 1253 n.13.

Here, however, the government has presented sufficient evidence to show that Mr. Pulido-Jacobo manifested a belief in the truth of the speaker receipt. First, Mr. Pulido-Jacobo kept this receipt for over two months after the speaker purchase.  Second, the officers found speakers in the trunk of the car matching those described in the receipt.  Thus, although possession alone cannot satisfy Rule 801(d)(2)(B), *Jefferson*, 925 F.2d at 1253 n.13, we do adopt the "possession plus" standard articulated by the First and Ninth Circuits, *United States v. Paulino*, 13 F.3d 20, 24 (1st Cir. 1994); *United States v. Ospina*, 739 F.2d 448, 451 (9th Cir. 1984).  Under this standard, we admit evidence pursuant to Rule 801(d)(2)(B) in cases such as this one where "the surrounding circumstances tie the possessor and the document together in some meaningful way." *Paulino*, 13 F.3d at 24; *see also Ospina*, 739 F.2d at 451.

## IV. MISTRIAL MOTION

The Pulidos also contend that the District Court erred in denying their motion for a mistrial. In that motion, they claimed that the District Court erred when, in admitting the speaker receipt, it referred to the receipt as a "possible admission."[2] The Pulidos claim that the statement "impaired [their] right to a fair trial and would have had an appreciable effect on the jury," apparently claiming that the jury could have taken the statement to mean that the Pulidos had admitted their guilt to the underlying charges. The government responds that this statement did not infringe on the Pulidos' right to a fair and impartial trial because the District Court "instructed the jury not to consider its rulings on objections during their deliberations."

A.    Standard of Review

When evaluating a motion for mistrial, a district court must first determine whether an error has occurred and, if so, whether that error impaired the "defendant's right to a fair and impartial trial." *United States v. Meridyth*, 364 F.3d 1181, 1183 (10th Cir. 2004). "We review a district court's refusal to grant a mistrial for abuse of discretion." *Id.* "In reviewing a court's determination for abuse of discretion, we will not disturb the determination absent a distinct

---

[2]Specifically, the District Court stated, "I think that [the receipt] may be a possible admission rather than hearsay."

-14-

showing it was based on a clearly erroneous finding of fact or an erroneous conclusion of law or manifests a clear error of judgment." *United States v. Mitchell* , 113 F.3d 1528, 1531 (10th Cir. 1997).

B.    Merits

The District Court did not err in referring to the speaker receipt as a "possible admission." Contrary to the Pulidos' claims, this statement does not assert that either of the Pulidos had admitted their guilt to the charged offenses. When viewed in context, the District Court was plainly referencing Rule 801(d)(2)(B) of the Federal Rules of Evidence, which is almost universally known as the adoptive admission rule. *See, e.g., Wright-Simmons v. City of Okla.*, 155 F.3d 1264, 1268 (10th Cir. 1998) (describing Rule 801 (d)(2)(B) as the "adoptive admissions" rule); 5 Jack B. Weinstein & Margaret A. Berger,      *Weinstein's Federal Evidence*  § 801.31 (2d ed. 2004)   . We refuse to find error in a district court's use of commonly accepted shorthand for Fed. R. Evid. 801(d)(2)(B) – adoptive admissions – when describing its belief that a document is admissible under that rule. We therefore affirm the District Court's denial of the Pulidos' mistrial motion.

## V. ALLEGATIONS OF PROSECUTORIAL MISCONDUCT

Finally, Mr. Pulido-Pedrosa argues that we should overturn his conviction based on alleged prosecutorial misconduct at trial, claiming that the misconduct

violated his due process rights by shifting the burden of proof to the defendants. To support this assertion, Mr. Pulido-Pedrosa notes that, at trial, his counsel asked a government fingerprint expert whether, if he had tested all of the bags containing methamphetamine for fingerprints, "we would know that Mr. Pulido[-Jacobo] and Mr. [Pulido-Pedrosa] didn't touch any of these bags." The expert responded, "I don't know that. They would have to testify to that." On re-direct examination, a prosecutor asked the expert, "Does the Wyoming Crime Lab accept requests from defense attorneys to analyze for latent prints on packaging materials?" Despite objections from the Pulidos' attorneys, the District Court permitted the expert to respond, to which he said "yes."

A. Standard of Review

"Allegations of prosecutorial misconduct are a mixed question of law and fact, which we review de novo." *Duckett v. Mullin*, 306 F.3d 982, 988 (10th Cir. 2002). We undertake this analysis through a two-step process. "We must first examine whether the prosecutor's conduct was in fact improper, and if so, then determine whether . . . [the error was] . . . harmless beyond a reasonable doubt." *United States v. Martinez-Nava*, 838 F.2d 411, 416 (10th Cir. 1988). The government bears the burden to show that a constitutional error is harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24 (1967). To determine whether prosecutorial misconduct is harmless, "we must look to the

curative acts of the district court, the extent of the misconduct, and the role of the misconduct within the case as a whole." *Martinez-Nava*, 838 F.2d at 416.

B. Merits

Here, "[w]e need not decide whether [these allegations] represent prosecutorial misconduct, because we are satisfied that" any error was harmless. *Id*. First, any possible error from the examination in question derived not from the substance of the answer—that the defendants had the ability to request a fingerprint test—but from an inference that the burden rested on them to do so. The District Court ameliorated any error resulting from this inference by instructing the jury repeatedly that the burden for proving the defendants' guilt beyond a reasonable doubt rested solely on the government.[3]

Second, the extent of the misconduct in this case—if any—was minimal. The examination in question constituted three lines of a trial transcript numbering almost three hundred pages. Indeed, after receiving an answer to its question, the government did not again mention the issue.

Finally, the government presented substantial additional evidence at trial to support the guilty verdicts. *See supra* pp. 6-9. Thus, we find beyond a reasonable

---

[3]For example, the District Court submitted the following instruction to the jury: "Remember as well that the law never imposes upon a defendant in a criminal case the burden or duty of calling any witness or producing any evidence, because the burden of proving guilt beyond a reasonable doubt is always with the government."

doubt that the government's question, even if it constituted prosecutorial misconduct, was harmless error.

## VI. Conclusion

For the foregoing reasons, we AFFIRM the decision of the District Court.