**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**November 5, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

MIGUEL ANGEL RODRIGUEZ-
FLORES,

     Defendant - Appellant.

_____

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

JOSE REMBERTO GUZMAN-
DOMINGUEZ,

     Defendant - Appellant.

No. 17-2039
(D.C. No. 2:16-CR-00580-RB-2)
(D. N.M.)

No. 17-2136
(D.C. No. 2:16-CR-00580-RB-1)
(D. N.M.)

_____

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. Nos. 2:16-CR-00580-RB-1 & 2:16-CR-00580-RB-2)**

_____

Howard A. Pincus, Assistant Federal Public Defender (Virginia L. Grady, Federal Public Defender, with him on the briefs), Denver, Colorado for Defendant-Appellant Miguel Angel Rodriguez-Flores.

Todd A. Coberly, Coberly & Martinez, LLLP, Santa Fe, New Mexico for Defendant-Appellant Jose Remberto Guzman-Dominguez.

Richard C. Williams, Assistant United States Attorney (James D. Tierney, Acting United States Attorney, with him on the briefs), Las Cruces, New Mexico for Plaintiff-Appellee.

_____

Before **LUCERO**, **HARTZ**, and **HOLMES**, Circuit Judges.

_____

**HARTZ**, Circuit Judge.

_____

Defendants Jose Remberto Guzman-Dominguez and Miguel Angel Rodriguez-Flores were arrested at a state port of entry after an inspector found cocaine and heroin in their truck (a tractor-trailer). The truck contained a large quantity of legitimate cargo (chemical cleaner), but four boxes containing the drugs, weighing more than 115 pounds, were concealed behind that cargo. After a joint trial in the United States District Court for the District of New Mexico, Defendants were convicted on all three counts of the indictment against them: (1) conspiracy to distribute at least five kilograms of cocaine and at least one kilogram of heroin, *see* 21 U.S.C. § 846; (2) possession with intent to distribute at least five kilograms of cocaine, *see id.* §§841(a)(1) and (b)(1)(A); and (3) possession with intent to distribute at least one kilogram of heroin, *see id.* The chief issue at trial was whether Defendants knew of the contraband in the truck. Both had denied knowledge in statements to law-enforcement officers after their arrests. Guzman-Dominguez repeated the denial of knowledge in his trial testimony. Rodriguez-Flores did not testify.

On appeal Rodriguez-Flores challenges the sufficiency of the evidence that he knew of the contraband in the truck, and both Defendants challenge the unobjected-to admission of a statement by an expert witness that he did not believe persons transporting

2

drugs who denied knowledge of the drugs. But the evidence was more than sufficient for a reasonable juror to infer beyond a reasonable doubt that Rodriguez-Flores was involved in the drug offenses. And on plain-error review of the admission of the expert testimony, we hold that Defendants have not shown the prejudice necessary to require reversal. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.  SUFFICIENCY OF THE EVIDENCE AGAINST RODRIGUEZ-FLORES

We review de novo the sufficiency of evidence for a criminal conviction, viewing "the evidence in the light most favorable to the verdict to ascertain whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt." *United States v. Smith*, 641 F.3d 1200, 1204–05 (10th Cir. 2011). In making this determination, we cannot weigh conflicting evidence or consider the credibility of witnesses, but instead we defer to the jury's resolution of these matters. *See United States v. Brooks*, 438 F.3d 1231, 1236 (10th Cir. 2006). And "rather than examining the evidence in bits and pieces, we evaluate the sufficiency of the evidence by considering the collective inferences to be drawn from the evidence as a whole." *Id.* (brackets and internal quotation marks omitted).

Rodriguez-Flores challenges the sufficiency of the evidence against him. "To obtain a conviction for conspiracy, the government must prove that (1) there was an agreement to violate the law; (2) Defendant *knew* the essential objectives of the conspiracy; (3) Defendant *knowingly and voluntarily took part* in the conspiracy; and (4) the coconspirators were interdependent." *United States v. Pulido-Jacobo*, 377 F.3d 1124,

3

1129 (10th Cir. 2004) (emphasis added) (internal quotation marks omitted).  To prove the two counts of possession with intent to distribute, "the government must show that [1] the defendant possessed the controlled substance; [2] *knew that he had it*; and [3] possessed it with the intent to distribute it."  *Id.* at 1131 (emphasis added) (internal quotation marks omitted).

Rodriguez-Flores does not challenge the sufficiency of the evidence on most of the elements of the three offenses.  He limits his argument to the sufficiency of the evidence that he knew about the drug cargo.  That is, he does not argue that even if he knew about the drugs, he was innocent of the charges.

We reject the challenge.  As we proceed to explain, there is compelling evidence that the drugs were added to the cargo after Defendants picked up the chemical cleaner, that Defendants were together and controlled the truck from the time of that pick-up until their arrests a few hours later, and that they were close associates who were working together in the venture.

### A.    The Evidence

### 1.  The Arrests

On November 14, 2015, at 12:29 a.m., Guzman-Dominguez drove his commercial truck into the state port of entry on Interstate 10 near Lordsburg, New Mexico.  Rodriguez-Flores was his sole passenger.  Inspector Jesus Salcedo was assigned to do level 1 inspections, which involve examining paperwork, the truck, and the cargo.  Salcedo testified that as he was examining the underside of the vehicle, Guzman-Dominguez was unusually chatty.  Guzman-Dominguez told the inspector that he had just

4

installed new brakes, but Salcedo, a former mechanic, testified that there were no new brakes.

When Salcedo searched the cargo area of the truck, he saw 17 four-foot-by-four-foot totes (plastic containers inside metal cages) filled with liquid chemical cleaner. Each tote weighed about 2400 pounds. According to the bill of lading, signed by Rodriguez-Flores but given to Salcedo by Guzman-Dominguez, the totes had been picked up the previous day from Mirachem, an industrial-cleaner manufacturer in Phoenix, Arizona. Climbing into the truck and over the totes, Salcedo discovered four cardboard boxes, which were unaccounted for in the bill of lading. One box was open, and he saw green saran-wrapped bundles inside. From his training he believed the boxes contained narcotics, so he returned to his booth to report the discovery. (It was later determined that the boxes contained 47.9 kilograms of cocaine and 5.24 kilograms of heroin.)

Two New Mexico State Police officers who had arrest power arrived and arrested Defendants. Defendants were not interviewed, however, until after the arrival at 4:35 a.m. of Agents Antonio Palomares and Johnathan Butler with the Investigations Bureau of the New Mexico State Police. The agents began recorded interviews with Guzman-Dominguez at 5:23 a.m. and with Rodriguez-Flores about 6 a.m. Two investigators with the Department of Homeland Security (DHS)—Task Force Officer Jose Lopez and Special Agent William Shafer—arrived about 9:00 a.m. They interviewed Guzman-Dominguez at 10:30 a.m. and Rodriguez-Flores at 11 a.m.

## 2.     The relationship between Defendants

Defendants were not mere acquaintances, nor did they have a typical employer-employee relationship. Their friendship and association were described in Guzman-Dominguez's trial testimony and Rodriguez-Flores's statements to law-enforcement officers after his arrest. The two men had known each other since they were children in El Salvador. A few months before their arrests, they had reconnected through Facebook after 15 years without seeing one another. Rodriguez-Flores, who had been struggling financially while living in California, began working with Guzman-Dominguez in June 2015 so that he could learn the business of commercial driving and get his commercial driver's license. Guzman-Dominguez's trucking business was based in Las Vegas, Nevada; but he kept his truck in Phoenix, Arizona, because more loads were available there. While the two men worked together, they slept in the two beds in the sleeper compartment of the truck; they "practically lived in the truck." R., Vol. XI at 85–86. Guzman-Dominguez paid Rodriguez-Flores between $150 and $400 per week, depending on how much he made. The justification for Rodriguez-Flores's compensation was that his English was superior to Guzman-Dominguez's, so he could communicate better with brokers and shippers. The two planned to go into business together once Rodriguez-Flores got his commercial license as two drivers can make more money than one. During his trial testimony, Guzman-Dominguez referred to Rodriguez-Flores as his "partner."

Defendants traveled together even when they were not working. In early November, Guzman-Dominguez received a phone call from his sister in El Salvador, saying that their father had suffered a heart attack. Rodriguez-Flores was with him when

6

he received the call. When Guzman-Dominguez said that he would be going to El Salvador to see his father for a few days, Rodriguez-Flores offered to keep him company on the trip, saying he wanted to see his family in El Salvador, where he had not been for 15 years. Defendants traveled by plane to El Salvador together, spent five days with their respective families, and then reunited for the flight home. While in El Salvador, Guzman-Dominguez had a toothache, but a dentist was not able to treat it while he was there because his blood sugar was too elevated (he has diabetes). After returning to Phoenix, Guzman-Dominguez drove his car to Nogales, Mexico, to see a dentist, who also could not operate on the tooth but gave him some antibiotics. Rodrigues-Flores accompanied him.

### 3. Getting the job to haul the chemicals

While in Nogales, Guzman-Dominguez attempted to obtain a contract to haul a load of cargo. On November 12 he used a broker service connecting drivers to cargo to search for a load he could pick up in Phoenix, but he could not come to an agreement with the broker. He continued his search the next morning.

On November 13 at 7:07 a.m., Rodriguez-Flores told a cousin in a Facebook chat that he would be going to Michigan and Quebec. But Guzman-Dominguez had not yet booked a shipping contract. A search of his computer showed that at 8:09 a.m. he conducted a search on the broker-service website that led to his booking the load from Mirachem in Phoenix to Crystal Clean in Fairless Hills, Pennsylvania.

After securing the load, Defendants drove back to Phoenix to retrieve the truck. The truck had been kept at Vasquez Diesel, which repairs trucks and rents parking spaces

for them.  When Defendants arrived, they discovered that a battery had died, so they had to purchase a new one and have it installed.  Running a bit late for their pickup, Defendants arrived at Mirachem shortly after 3:00 p.m. on the 13th.  Mirachem's warehouse shipping manager John Markovci estimated that it would have taken about 15 minutes to load the totes of cleaning products into the trailer.

Markovci testified that it would be nearly impossible for someone to place four cardboard boxes in the truck during the loading at Mirachem without being noticed, and he was surprised when he heard that the drugs had been found with Mirachem's product because nothing like that had happened in the past.  Although he did not specifically remember loading the cargo on  November 13, 2015, Markovci said that only he and Anthony Oliver loaded trucks for Mirachem at that time.  Markovci testified that he was not a drug trafficker and had never loaded illegal drugs into a commercial vehicle at Mirachem.  Anthony Oliver similarly testified that he did not specifically remember loading any vehicles on that date, but he was not a drug trafficker and had never loaded illegal contraband into a commercial vehicle.

Similarly, the hub manager for Crystal Clean testified that in November 2015 only he and six others worked at the warehouse that would offload trucks.  They had to wear distinctive protective equipment and no one else would be allowed in the area.  Also, the only person unloading the truck would be the forklift operator, so it would be unusual and readily noticed if someone was carrying smaller boxes off a truck.

After the legitimate cargo was loaded on the truck, a Mirachem employee gave Guzman-Dominguez a bill of lading describing the cargo and a commercial seal.  Once

the seal is placed on the trailer doors, the cargo area cannot be opened without breaking the seal, and the seal cannot be refastened. Thus, an unbroken seal shows the recipient that the cargo has not been tampered with on the trip. But although Guzmán-Rodriguez admitted that he went to the trailer after the cargo was loaded and affixed a strap to hold the cargo in place and closed the trailer door, he did not put on the seal. Sergeant Terri Gomez, the officer who arrested Guzman-Dominguez, saw the unbroken seal in the passenger area of the truck, where Rodriguez-Flores would have been riding, and found it unusual that it was not used to seal the trailer. She testified, "[W]hen a seal is given to a driver, almost always, the seal is placed on the trailer." R., Vol. VIII at 160.[1] The seal in the truck was a light one. She explained that a heavy seal was unnecessary because the size and weight of the totes would make it difficult for a thief to remove them from the truck, and a lighter seal is the normal practice with such cargo.

Instead of a seal, there was a padlock on the truck. When Inspector Salcedo asked Guzman-Dominguez to open the lock, he fumbled with several keys on a ring, tried a few, stated the keys were in the truck, walked halfway to the cabin of the truck, and then finally returned, saying the key had been on the ring all along. Salcedo found this unusual as truckers are generally eager to be back on the road and hence are prepared for inspections.

---

[1] Rodriguez-Flores points out that Sgt. Gomez testified that in general there is nothing suspicious about a commercial truck not having a commercial seal while traveling on the highway. Her point, though, was that *if the shipper provides a seal* (as was the situation here), it is highly unusual not to have it put on.

Although Guzman-Dominguez told DHS agent Lopez that the reason he did not put the seal on the truck was that he had forgotten to do so, his explanation at trial was that it is the shipper's responsibility to place the seal on the truck, and that some companies do not attach the seal or require that it be attached. He instead set the seal with the bill of lading in the window of the vehicle, which is his custom. He acknowledged that he did not expect someone to steal the cargo due to its size and weight, but he insisted that even if the seal had been placed on the cargo doors, truckers would still use a padlock "for our own safety" because this particular seal could be easily broken and someone could go into the trailer. R., Vol. XI at 73. Rodriguez-Flores provided the state police investigators with a puzzling explanation for the padlock: "[W]e don't know what we're carrying. So, we just, we just lock it." Gov't Ex. 26A at 12–13.

Joseph Montoya, a special agent with the Drug Enforcement Administration (DEA), testified as an expert witness for the government. He said that drug traffickers typically avoid attaching the seal at the time it is provided by the shipper because it will need to be broken when drugs are loaded in with the legitimate cargo. Instead, they generally wait to attach the seal until after they drop off the illegal contraband so that when the legitimate load is delivered, the seal will be unbroken. To protect against theft of the drugs, however, they commonly use a padlock.

### 4. The departure from Phoenix

Because Defendants arrived at Mirachem shortly after 3:00 p.m., and it would normally take about 15 minutes to load the cargo, they likely left Mirachem by 3:30 p.m.

10

But they did not depart Phoenix for another four hours. At 4:14 p.m. Defendants filled their truck with fuel at the Flying J, a truckstop in Phoenix, as shown by a receipt found in the truck that matches Flying J's records. In his state-police interview Rodriguez-Flores said that after loading the truck at Mirachem they returned to Vazquez Diesel (which is only a couple blocks from the Flying J), "ate and then . . . hit the road." R, Vol. IX at 100–01. He did not mention any delay after picking up the load, and he stated that the only time the truck was left alone was while he and Guzman-Dominguez ate. In his DHS interview Rodriguez-Flores said that after getting the load they took about an hour to return to Vasquez Diesel and get something to eat before leaving Phoenix. Guzman-Dominguez testified that Defendants were together all day and that after they left Mirachem no one else had access to the trailer. He also said that while they were eating at the truck stop they kept their eyes on the truck.

Electronic data indicated that Defendants' departure from Phoenix was much more than an hour after fueling. Records of the cell-phone providers for phones of both Guzman-Dominguez and Rodriguez-Flores indicated that they were still in Phoenix at 7:36 p.m. And data retrieved from a GPS device found on the dash of the cab of the truck shows that it was at Vazquez Diesel at 2:35 p.m. and 7:40 p.m.

At trial Guzman-Dominguez accounted for the three and a half hours between fueling the truck and leaving Phoenix by explaining that Defendants heard a tire thumping while at Vazquez Diesel, so they had the tire and the kingpin (which connects the tractor to the trailer) repaired there before departing. He testified that they left after 7:00 p.m. He said that he had told the New Mexico State Police about the tire and

11

kingpin repairs in his postarrest interview. New Mexico State Police Agent Antonio

Palomares admitted this, but he testified that Guzman-Dominguez was vague about when

these repairs were actually completed and was clear that they left Phoenix shortly after

eating and refueling.[2] In addition, Guzman-Dominguez testified that they ate at the

Flying J at 4:30 p.m. and then at Vasquez Diesel about 7:30 p.m. while waiting for the

repairs. But in a postarrest interview he had stated that he had not eaten since 4:30 p.m.

---

[2] The relevant portion of the interview is as follows:

| | |
|---|---|
| **PALOMARES** | OK . . . so . . . You arrived [in Phoenix] on November eleventh (11th) . . . |
| **GUZMAN** | Mh hmm. |
| **PALOMARES** | . . . so . . . You loaded the truck there . . . |
| **GUZMAN** | The truck there . . . I pay for a place where I park it . . . [Voices Overlap] |
| **PALOMARES** | . . . [Voices Overlap] . . . Like a storage . . . or what? . . . |
| **GUZMAN** | No . . . It is a mechanical shop where one does repairs . . . and all . . . And I park it there . . . I pay by month . . . |
| **PALOMARES** | And they did some repairs? . . . |
| **GUZMAN** | . . . uh . . . They changed a tire . . . and they welded a part that goes in . . . in the fifth wheel the kingpin . . . |
| **PALOMARES** | OK . . . so . . . You arrived on the eleventh (11th) . . . and then . . . **EXTREMELY LOUD BACKGROUND NOISE** |
| **PALOMARES** | . . . You say that you went to Mexico . . . or to . . . [Unintelligible] . . . El Salvador . . . |
| **GUZMAN** | No . . . I came from El Salvador and I went to Mexico to see my doctor because I had problems with my sugar . . . I have a molar that has been hurting me . . . |

R., Vol. III at 51 (ellipses in original transcript).

12

Guzman-Dominguez also testified that while driving between Phoenix and Lordsburg they made only two short stops to use the restroom and to place a padlock on the cargo doors of the truck. He said that Rodriguez-Flores put the lock on the doors at his direction after he noticed the lock on the floor of the cab.

The trip from Phoenix to the Lordsburg port of entry takes about four and a half hours. Because Defendants arrived at the port of entry at 12:29 a.m., they could not have left Phoenix much before 8 p.m., almost four hours after fueling at the Flying J, if they made only two brief stops on the way.

### 5. Defendants' offer to make a controlled delivery

During interviews after their arrests, both Defendants denied knowledge of the drugs and offered to help law enforcement find the true drug traffickers by performing a "controlled delivery" in which they would drive the truck with the drugs to its destination. But the offer was not accepted. In opening statements and closing argument at trial, defense counsel pointed to the offers as evidence that Defendants were unwitting couriers, who were unaware that they were transporting drugs. DEA Agent Montoya, testifying as an expert witness, said that while the DEA may execute controlled deliveries to get to higher-ups in a drug organization, he would never do a controlled delivery if the couriers denied knowledge of the drugs because law enforcement needs the couriers to make contact with the organization, which is not possible if they claim ignorance. State police agent Palomares testified that by the time DHS agents arrived, too much time had elapsed to do a controlled delivery. DHS agent Schaefer said that they did not proceed with a controlled delivery because the officers did not believe Defendants.

13

### 6. Other expert testimony

Agent Montoya testified that the cocaine, if sold in bulk in Arizona at the time of the arrest, would have been worth approximately $1,197,500, and the heroin in bulk in Arizona would have been worth $220,080. Because the price of narcotics increases as the drugs move across the country to the northeast and are cut (that is, diluted with other substances, such as caffeine) and distributed, their value rises significantly. Once cut and sold on the street in Philadelphia, near the destination of the legitimate cargo, the cocaine would have been worth about $9,580,000 and the heroin would have been worth up to $2,620,000.

Montoya explained that it is unusual for drug organizations to use unwitting couriers to transport very valuable drugs because drug organizations want to be sure where the drugs are going and an unwitting courier might make a detour or break down. He said that unwitting couriers are used only with small amounts of marijuana in vehicles crossing the US/Mexico border. The one "true blue" unwitting courier he had encountered was the wife of a man who was knowingly transporting an ounce of cocaine across the border. With a large quantity of valuable drugs, he testified, it was likely that the transporter not only knew of the drugs but had been transporting drugs long enough to gain the trust of the drug organization to handle valuable contraband. [3] Montoya added

---

[3] In response, Defendants called as an expert witness Robert Alvarez, a private investigator who had retired after a career as an investigator with the United States Customs Service and the Department of Homeland Security. Before permitting him to testify as an expert, the district court noted that "in spite of a very impressive resume and lots of great service, [he] hasn't ever worked a case such as this, nor has he worked in

14

that with a load of the size carried by Defendants, drug organizations monitor the trip by using a GPS, making telephone calls, or having another person in the organization follow in a different vehicle or ride along with the load to make sure the vehicle gets through. The drug monitor is usually higher in the organization than the driver and sends updates, generally through cell phones, to the drug organization so that it knows that the drugs have made it through certain checkpoints.

There were at least four cell phones found in the cab of the truck. Montoya testified that drug traffickers typically have several cell phones to conduct their drug operations, keeping them separate from personal cell phones.

### B.     Analysis

Rodriguez-Flores's challenge to the sufficiency of the evidence against him borders on the frivolous. We need not recite every item of incriminating evidence. This is not the typical case of a passenger in a vehicle where there is no evidence of when the contraband was put in the vehicle or of where the passenger was at that time. Here,

---

drug trafficking investigations in 13 years." R., Vol. XI at 141. Alvarez testified that unwitting couriers would be useful to drug-trafficking organizations because they would not be able to reveal higher-ups in the organization, would not appear nervous when stopped by law enforcement, and would not be paid extra for transporting the cargo. On cross-examination, however, he conceded that in his experience unwitting couriers had been used only at the international border, which is a lot harder to cross with contraband than an interstate border. And on direct examination when asked if he had seen the use of unwitting couriers with commercial vehicles the only example he gave seemed unresponsive: he spoke of a DEA raid near the border where employees of a legitimate company were loading drugs into a commercial truck. Perhaps he misunderstood the question.

there is no dispute that the drugs were not in the trailer when the truck arrived at Mirachem. Thus, the possibilities are quite limited.

One possibility is that the Mirachem employees added the drugs to the legitimate cargo. The only two men who might have loaded the chemical cleaners, however, denied having added the drugs and no one else could have entered the trailer without their knowledge. The jury could have believed them based solely on their demeanor while testifying. But the suggestion that they added the drugs to the trailer is highly questionable on its face. First, they would need to be sure that their co-conspirators at Crystal Clean in Pennsylvania would be the ones unloading the trailer upon its arrival. Again, the jury could reasonably have believed the Crystal Clean witness who indicated the unlikelihood of that happening. More importantly, it is hard to believe that a Mirachem employee who added the drugs to the legitimate cargo would not protect the multimillion-dollar investment by adding a seal (and a padlock) to prevent entry into the trailer (not only by burglars but also by the driver and passenger in the vehicle) before its arrival at its destination. After all, this theory exculpates Defendants only if they were not in on the conspiracy and therefore could not be trusted by the true culprits. This theory also requires believing that someone at Mirachem had been storing four boxes containing more than 115 pounds of drugs at the facility so that they could be quickly loaded when the trucker arrived. Is the theory that everyone at Mirachem was in on the conspiracy?

A second possibility is that somebody else entered the trailer without Defendants' knowledge and inserted the boxes of drugs. But this theory also makes no sense. (How

16

could that other person have any confidence that the valuable cargo would safely reach the desired destination?) And besides, Defendants said that they were with the truck at all times between loading up at Mirachem and their arrival at the port of entry. Guzman-Dominguez testified at trial that even as they ate dinner at the truck stop, they kept their eyes on the truck.

The only remaining possibility is that the drugs were loaded into the trailer with the knowledge and assistance of at least one Defendant. The evidence at trial clearly established that there was ample opportunity for this to occur. Cell-phone records and GPS data showed that Defendants did not leave Phoenix for another four hours after picking up the legitimate cargo. And this possibility explains why Defendants would put a padlock on the trailer (to protect the drugs) but not a seal (which would need to be broken to later remove the drugs, thereby signaling to the recipient of the legitimate cargo that there may have been tampering with the cargo in transit).

Rodriguez-Flores is correct that some of the evidence was more incriminating against Guzman-Dominguez. The experienced commercial driver would better understand the role of the seal and why it should not be applied until the contraband had been delivered. The extra cell phones, which can suggest and corroborate drug trafficking, may have all been under the control of Guzman-Dominguez. And the expert testimony regarding the implausibility of unwitting couriers, although directed at both men, may have greater force with respect to the person in charge. But once it is established that Guzman-Dominguez was knowingly transporting the drugs, the guilt of Rodriguez-Flores readily follows. Given the very close relationship between the two

17

Defendants—including Guzman-Dominguez's purportedly paying his longtime friend for performing minimal services—one can readily infer that Guzman-Dominguez would not engage in such a risky criminal venture without informing his partner. And, in fact, Guzman-Dominguez testified that the two of them were together from the time they picked up the totes until their arrests.[4] Rodriguez-Flores's guilty knowledge is confirmed by his false statements to both state-police and DHS agents that the two men left Phoenix about an hour after picking up their cargo, thereby concealing that they had plenty of time to add contraband to the load.

The authority relied on by Rodriguez-Flores is inapposite. In *United States v. Samaria*, 239 F.3d 228, 231–33, 239 (2d Cir. 2001), *overruled on other grounds by United States v. Hueso*, 546 F.3d 174, 180 n.2 (2d Cir. 2008), the Second Circuit held that the defendant, who claimed to be a "gypsy cab driver," was not in constructive possession of boxes placed in his car by a passenger. But the facts in that case are distinguishable from the facts here on many grounds, including that the government presented no evidence that the defendant knew the alleged co-conspirators any more than a typical cab driver would know a customer. *See id.* at 232–23.

Another case relied on by Rodriguez-Flores is *United States v. Rahseparian*, 231 F.3d 1257 (10th Cir. 2000), which overturned a conviction for conspiracy. He cites it for

---

[4] Cell-phone records admitted at trial indicated that there was a nine-second call from Rodriguez-Flores to Guzman-Dominguez at about 4:26 p.m. and a 34-second return call from Guzman-Dominguez about 3 1/2 minutes later. But Guzman-Dominguez suggested during cross-examination by counsel for Rodriguez-Flores that one of them was fueling the truck while the other was inside paying the bill.

the proposition that false exculpatory stories cannot be used as direct evidence of guilt but only as circumstantial proof of consciousness of guilt. *See id.* at 1263. Circumstantial evidence can, however, be compelling, and we did not adopt a rigid rule that displaces the well-settled standard for reviewing sufficiency of the evidence. Rather, what we said was a commonsense proposition based on the specific context of that case. In *Rahseparian* the defendant had deposited checks on behalf of two sons who were engaged in a mail-fraud scheme. The only evidence of his knowledge of this scheme was his false statement to investigators about how he handled the funds. *See id*. at 1260–61. But his false statement was made a year and a half after the fraudulent scheme had ended and it was clear from the investigators' inquiries that his sons were suspected of criminal activity. *See id.* at 1264. As we said in reversing the conviction, the defendant "would understandably wish to protect [his sons]." *Id*. The context here is markedly different. Even without Rodriguez-Flores's false statement, there is highly probative evidence of his knowledge of the contraband in the truck—it was added between the time that the two men left Mirachem and the time they were arrested, during which period they were always together and were away from the truck only while eating. In this context the most plausible explanation for Rodriguez-Flores's lie was to conceal from the investigators that Defendants had loaded the contraband into the truck before departing Phoenix.

Finally, Rodriguez-Flores points to *United States v. Ramirez*, 176 F.3d 1179, 1180–81 (9th Cir. 1999), which rejected the government's argument that it would be reasonable to infer (beyond a reasonable doubt) that a passenger in a vehicle driven by a friend into the United States from Mexico carrying $37,000 worth of marijuana was

19

himself entrusted with the marijuana. But Rodriguez-Flores was hardly just a friend going along for the ride. A much more pertinent case is our decision in *Pulido-Jacobo*, 377 F.3d at 1130, where the vehicle contained marijuana worth between $248,000 and $2.1 million. We said that "[g]iven the substantial value of this contraband, a rational jury could conclude that it would not likely be placed in a car without the knowledge of its occupants." *Id.* Although the defendant-passenger in that case shared driving duties with his father, *see id.*, in this case Rodriguez-Flores was in business with the driver, even being referred to as his "partner."

We reject Rodriguez-Flores's challenge to the sufficiency of the evidence against him.

## II. EXPERT TESTIMONY ON CREDIBILITY

Both Defendants challenge the admission of a statement by expert witness Agent Joseph Montoya that they contend expressed an opinion on their credibility. At trial, Defendants did not object to the testimony or request a limiting or corrective instruction (although the district court at the end of trial gave the standard instruction that the jurors are the sole judges of the credibility of witnesses). Because the challenge was not preserved below, we review only for plain error. *See United States v. Bagby*, 696 F.3d 1074, 1084 (10th Cir. 2012). "Plain error is (1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (internal quotation marks omitted).

Montoya's challenged statement was made at the end of the following exchange during his direct testimony:

20

Q: During the course of your career at DEA, approximately how many drug traffickers have you debriefed?
A. That would be hundreds of drug traffickers.
Q. And during those debriefings, did any of these drug traffickers ever tell you things that were not true?
A. Yes.
Q. In your professional experience, was it common or uncommon for drug traffickers to tell you things that weren't true?
A. It was common.
Q. Okay. And have you been involved in cases in which people who were found transporting drugs claimed to have no knowledge of those drugs?
A. Yes.
Q. *Did you generally believe these people were telling the truth when they told you they didn't know about the drugs they were transporting?*
A. *No.*

R., Vol. X at 256 (emphasis added).

Under Fed. R. Evid. 702(a) a qualified expert may provide opinion testimony if it "will help the trier of fact to understand the evidence or to determine a fact in issue." But "the credibility of another is not an appropriate subject for expert opinion testimony." *United States v. Hill*, 749 F.3d 1250, 1260 (10th Cir. 2014). This limitation applies not only to the credibility of trial witnesses but also of out-of-court declarants. *See id.* at 1261. And the prohibition applies not only when the expert expresses an opinion about specific persons but also when the opinion concerns a class of persons that includes persons whose credibility is at issue in the trial. *See United States v. Benally*, 541 F.3d 990, 993 (10th Cir. 2008) (affirming the exclusion of expert testimony on the frequency of false confessions and the investigation techniques known to cause them).

We therefore agree with Defendants that it was clearly error to permit Montoya to testify to his opinion that drug couriers who deny knowledge of the drugs are lying. *See Hill*, 749 F.3d at 1258 (admission of opinion testimony on credibility of defendant was

21

error that was plain).  We are not persuaded by the government's arguments to the contrary.  First, it argues:

> Testimony by an expert about his experience with organizations using unwitting couriers requires that expert to describe the circumstances in which law enforcement, himself included, believed that couriers were in fact unwitting. Such an expert would be unable to put this testimony into context, though, if prohibited from commenting on the occasions when law enforcement, himself included, did not believe that couriers were unwitting.

No. 17-2136 Appellee's Answer Br. at 18.  In our view, however, an expression of expert opinion regarding credibility was wholly unnecessary to put anything in context.

Next the government claims that the testimony was necessary to rebut Defendants' implication that law enforcement should have used them to make a controlled delivery – that is, allow them to continue their journey to see who would pick up the drugs.  But Montoya's explanation for why it is inappropriate to pursue a controlled delivery by purportedly unwitting couriers was not based on any assessment of credibility:

> Q: Would you ever do a controlled delivery if the courier or couriers denied knowledge of the drugs?
> A. No, I would never do that.
> Q. Why not?
> A. Because you have to -- our -- one of the first things we do when we attempt to do a controlled delivery is we have full cooperation of the defendant and we usually immediately make tape-recorded telephonic contact with the organization to get the ball moving on the controlled delivery. . . .

R., Vol. X at 284.

To obtain relief, however, Defendants must also establish the third component of plain-error review— an infringement of their substantial rights. "To show that an error affected his substantial rights, [a defendant] must establish a reasonable probability that,

22

but for the error claimed, the result of the proceeding would have been different." *United States v. Uscanga-Mora*, 562 F.3d 1289, 1295 (10th Cir. 2009) (internal quotation marks omitted).

Defendants argue that little prejudice was required to change the verdict because the evidence against them was weak. Rodriguez-Flores also argues that the challenged testimony undermined his central defense, that he did not know of the drugs, by impermissibly impugning his out-of-court statements. Guzman-Dominguez adds that cross-examination of Montoya did not cure the error of admitting this testimony, because it did not reveal a lack of foundation for the testimony or Montoya's lack of specialized knowledge of credibility. He also complains that there was no specific curative jury instruction, but only generalized instructions that the jury alone determines credibility.

These arguments could carry the day in other circumstances. But not here. Several considerations lead us to that conclusion: (1) Montoya did not present himself as an expert on indicia of truth-telling; (2) the incriminatory gist of the challenged statement was presented to the jury through other testimony that was not challenged at trial and is not challenged on appeal; and (3) the evidence against Defendants was very strong.

To begin our analysis, it is useful to review the basis for our prohibition on expert testimony regarding veracity. We have said that such expert testimony is improper because it "(1) usurps a critical function of the jury; (2) is not helpful to the jury, which can make its own determination of credibility; and (3) when provided by impressively qualified experts on the credibility of other witnesses is prejudicial and unduly influences the jury." *Hill*, 749 F.3d at 1258. (internal quotation marks omitted). When we say that a

23

jury "can make its own determination of credibility," we are recognizing that the life experiences of 12 adults is our time-tested traditional mechanism for assessing whether demeanor, manner of speaking, internal contradictions, inconsistencies with other evidence, etc., indicate that a person is fabricating a story. Perhaps someone with special training in psychology can perform that task better than other people, but we are skeptical that such a person can really improve upon a jury's assessment, and we are concerned that a jury may be "unduly influence[d]" by such a purported expert. *Id.*

Our opinion in *Hill* provides a classic example of improper expert testimony. The expert witness in that case was an FBI Special Agent who had taken "two specialized courses in interrogation and interviews," part of which was "psychological," so that he could "identify . . . deception in statements and truths in statements." *Id.* at 1255 (internal quotation marks omitted). This training included assessing "responses that occur naturally, that's a psychological thing that happens, that we do not control." *Id.* at 1256 (internal quotation marks omitted).

*Hill* did recognize, however, that sometimes even psychological testimony can be helpful to the jury, and therefore admissible, as when experts talk about mental or personality disorders (such as ones causing individuals to tell false stories, even false confessions) that jurors could not be expected to be familiar with. *See id.* at 1262. And, of course, there is no limitation on expert-opinion testimony that does no more than indicate that a witness's version of events was not true.

In this case, Montoya did not suggest that he had any expertise in psychology. It is clear from his testimony, and would have been clear to the jury, that his opinion that

24

couriers denying knowledge are lying was based solely on his experience showing that couriers—at least those transporting large, valuable quantities of drugs within the United States—know about their cargo. For example, Montoya had the following exchange on direct examination:

> Q. During your career, how many cases have you worked on that involved unwitting couriers?
> A. As far as that I've worked?
> Q. You, personally.
> A. I've had obviously people who have claimed to have been unwitting, but through the investigation they're found not to be.

R., Vol. X at 258. He determined that the couriers' claims were untrue by investigating the facts, not by assessing the couriers' manner of speaking, etc. Defendants did not challenge at trial, and do not challenge on appeal, the admissibility of this expert-opinion testimony. The inference that a denial of knowledge in the circumstances is not credible is not based on any deference to some purported expertise of Montoya (who never claimed such expertise) in assessing credibility. And it is such a strong and natural inference that the jury was highly likely to draw the inference without Montoya's improper opinion testimony on credibility. *See also Pulido-Jacobo*, 377 F.3d at 1130 ("Given the substantial value of this contraband [between $248,000 and $2.1 million], a rational jury could conclude that it would not likely be placed in a car without the knowledge of its occupants."). Say, a physiologist testified that no human could run as far and as fast as witness A claimed to have run and then improperly added, "I don't believe witness A's statement that he ran so far so fast." The quoted statement would add

25

virtually nothing to the weight of the testimony. We note that during closing argument the prosecutor made no mention of Montoya's credibility opinion.

Moreover, other testimony at trial differed from Montoya's challenged statement only in that it was directed specifically at Defendants' credibility, as opposed to "unwitting" couriers in general; and the admissibility of that testimony is sufficiently apparent that Defendants have not challenged it on appeal. *See United States v. Schene*, 543 F.3d 627, 640–41 (10th Cir. 2008) (admission of testimony similar to challenged testimony undermined argument that admission of challenged testimony violated substantial rights). DHS Special Agent William Shafer discussed his interviews of Defendants in his direct testimony. The relevant portion was as follows:

> Q. . . . Why was a controlled delivery not conducted in the case of the -- Mr. Guzmán and Mr. Rodriguez?
> A. Whenever we respond to a duty call, we interview the suspects independently. And based on the responses and what we determined would be the credibility of the suspects, we make a decision. And at that time, we did not believe the credibility of either of the stories.

R., Vol. X at 217–218. If the jury is going to defer to any law-enforcement officers regarding Defendants' credibility, surely they would give greater weight to the assessment of the officers on the scene than to the assessment of someone who was not there and claimed no psychological expertise.

Further, the other evidence of knowledge was not weak, but very strong. The drugs were almost certainly placed in the truck after Defendants picked up their legitimate cargo and while they admittedly were together and had control of the vehicle. Defendants have not persuaded us that the challenged testimony affected the verdict.

26

In short, Defendants have not shown that the admission of Montoya's statement affected their substantial rights at trial, and they are therefore not entitled to relief on this ground.

## III.    CONCLUSION

We **AFFIRM** Defendants' convictions.  We **GRANT** the government's unopposed motion to supplement the record.